UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-12319-RGS

BARBARA BRADLEY and
MICHAEL BRADLEY

v.

DAVID J. SUGARBAKER, M.D.

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

September 3, 2013

STEARNS, D.J.

In this medical malpractice action, plaintiff Barbara Bradley alleges that Dr. David Sugarbaker, a thoracic surgeon, failed to fully inform her of alternatives to an invasive surgery, and then negligently performed a thoracotomy, which caused a potentially life-threatening infection.[1] Bradley's

---

[1] More specifically, Bradley alleges that Dr. Sugarbaker "negligently performed a major surgery to acquire tissue to submit to pathology when he needed not acquire any tissue at all or, in the alternative, negligently performed a major surgery to acquire tissue when, under the circumstances pertaining, obtaining tissue should and could have been done by less intrusive means, including a fine needle aspirated biopsy, core biopsy, or thoroscopic biopsy." Def. Statement of Facts (SOF) ¶ 5, quoting Sec. Am. Compl. ¶ 18. She further contends that "[a]s a result of the unnecessary surgery that was performed, [she] was left with a space in her chest cavity, known as a pneumothorax, and a fistula, and was hospitalized for eight days." Def. SOF ¶ 6. Moreover, in October of 2005, Barbara "was diagnosed as having an aspergillus infection that lodged and was growing in the pneumothorax." Id. ¶ 7. Barbara claims to have sustained damages as a result of Dr. Sugarbaker's alleged negligence, battery, and failure to obtain her informed consent to treatment. Id. ¶ 8.

husband, Michael Bradley, alleges a loss of consortium. In this motion, Dr. Sugarbaker seeks summary judgment on all ten counts of the Second Amended Complaint. A hearing on the motion was held on August 14, 2013.[2]

## BACKGROUND

The facts, seen in the light most favorable to Bradley as the non-moving party, are as follows. On November 3, 2004, Dr. Steven Conway, a neurologist in Hartford, Connecticut, ordered Barbara Bradley to undergo an MRI as an aid in diagnosing a weakness she was experiencing in her right arm and hand. The MRI detected a mass in Bradley's upper right chest that was "suspicious of a Pancoast Tumor." *Id.* ¶ 11. Dr. Conway referred Bradley to Dr. Sugarbaker at Brigham and Women's Hospital for a second opinion. Dr. Sugarbaker told Bradley that he could not be certain whether or not she had developed cancer

---

[2] With rare exception, proof of medical malpractice involving a physician's exercise of judgment or skill requires expert medical testimony. In discharge of her obligation in this regard, Bradley has recruited Dr. Joseph Putnam, a thoracic surgeon who practices/teaches at Vanderbilt University Medical Center. Dr. Putnam provided an opinion that Dr. Sugarbaker should have explained to Bradley that she had the option to elect a fine needle biopsy and/or a bronchoscopy before considering surgery. Dr. Putnam also testified that the surgery caused a pneumothorax that developed into a post-surgical infection requiring a second surgery. At the hearing, Bradley's counsel produced a previously undisclosed supplemental affidavit from Dr. Putnam clarifying aspects of his expert report. As the supplemental affidavit was not disclosed in conformity with the requirements of Fed. R. Civ. P. 26(a)(2), and is objected to by Dr. Sugarbaker on that ground, the court will not consider it for present purposes.

in her lung without doing a biopsy. *Id.* ¶ 13.

On December 8, 2004, Bradley spoke by telephone with William Hung, Dr. Sugarbaker's physician's assistant. Hung told her "that the needle biopsy procedure was not an option and surgery would most likely be necessary in order to do a biopsy." He scheduled Bradley for a PET scan and appointment with Dr. Sugarbaker on December 14, 2004. Hung explained that the interventional radiologist, Dr. Francine Jacobson, had concluded that a fine needle aspiration was impractical because of the location of the tumor.[3] *Id.* ¶ 14.

At the December 14 appointment, Dr. Sugarbaker told Bradley that Hung would schedule a mini-thoracotomy at the earliest opportunity. He explained that the surgery would require an overnight hospitalization. The surgery was scheduled for December 17, 2004. *Id.* ¶ 16. Bradley testified that at the time she agreed to the surgery, she wanted Dr. Sugarbaker "to do biopsies to tell me if I had cancer," and "to perform a procedure which would determine whether

---

[3] Dr. Sugarbaker testified that either Hung or Dr. Jacobson (or both) had informed him that the location of the mass ruled out a fine needle aspiration. *Id.* ¶ 15. Neither Hung nor Jacobson recall the conversation with Dr. Sugarbaker. Hung testified at his deposition that if Dr. Jacobson had recommended against a fine needle aspiration, that advice should appear in Bradley's medical records. Hung Dep. at 74. Dr. Ralph Reichle (Dr. Sugarbaker's expert) and Dr. Mark Edelman (a witness for Bradley), both of whom are interventional radiologists, testified that based on the medical records, they could have performed a needle biopsy on Bradley without undue complication. Reichle Dep. at 10; Edelman Dep. at 41.

or not [she] in fact had cancer." *Id.* ¶ 17.

The day prior to the surgery, Bradley underwent preoperative testing at Brigham and Women's Hospital. A counselor met with her to discuss the mini-thoracotomy procedure and its risks, including possible infection and bleeding.[4] Bradley executed written consent forms.[5] *Id.* ¶ 19, *see also* Pl. Ex. 13. After undergoing the surgery, Bradley learned that Dr. Sugarbaker had performed a "wedge resection excising a 8.5 cm x 3.5 cm x 3.5 cm mass, that was not cancerous." Def. SOF ¶ 20.

Following the surgery, Bradley developed an aspergilloma, a result of spores of the fungus Aspergillus invading a surgically-induced pneumothorax.[6] Bradley underwent several subsequent surgeries to clean out the cavity. The operating surgeon, Dr. John Wain, testified that the fistula "was a complication

---

[4] Bradley does not contest that she understood the general risks of surgery to include infection, bleeding, stroke, and adverse reactions to anesthesia. *Id.* ¶ 18.

[5] Bradley claims that Dr. Sugarbaker and other hospital personnel explained only the mini-thoracotomy, and that the consent form she signed did not mention a wedge resection, partial lobectomy, trisegmentectomy or any other term that would denote the removal of "a massive portion of her lung." Pl. Opp'n Mem. at 4. Bradley alleges that had she known that a needle biopsy was a possible diagnostic alternative, she would have "insisted on it," and if the result was benign, "she would have declined any further surgical procedure." Pl. SOF ¶¶ 7, 8.

[6] A pneumothorax is a collection of free air in the chest outside the lung that causes the lung to collapse. Stedman's Medical Dictionary at 1394-1395 (26th Ed. 1995).

of [Dr. Sugarbaker's] prior surgical resection of her lung." Wain Dep. at 21, 64, 72, 77.

## DISCUSSION

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986).

The centerpiece of Dr. Sugarbaker's motion for summary judgment is a challenge to the legal sufficiency of the opinion of Dr. Putnam, Bradley's sole expert witness. Dr. Putnam posits negligence on Dr. Sugarbaker's part for:

(a) "failing to perform a less invasive procedure (such as needle biopsy or bronchoscopy) rather than thoracotomy as the first diagnostic procedure"; (b) "*[i]f* [Dr. Sugarbaker] dissuaded [Bradley] from consideration of needle biopsy . . . [he] departed from the standard of care"; (c) "*[i]f* [he] did not do so, [he] departed from the standard of care by failing to discuss with the patient and family the alternative options to wedge resection (such as needle biopsy or bronchoscopy) as part of informed consent"; and (d) "*[i]f* [he] did not do so,

5

[he] departed from the standard of care by failing to discuss the components of the planned operation, and the risks of the planned operation with the patient and family . . . ."[7] *Id.* ¶ 23 (emphases supplied).

Aside from the qualified phrasing, Dr. Sugarbaker focuses on Dr. Putnam's acknowledgment that a surgical biopsy was the prudent course to follow if a fine needle aspiration "could not be performed," a judgment that Dr. Putnam agrees is routinely made by an interventional radiologist and not the thoracic surgeon. *Id.* ¶¶ 24, 25. Moreover, Dr. Putnam concedes that a negative needle aspiration (which in hindsight would have been the result in Bradley's case) is not a sufficient basis for the average qualified thoracic surgeon to conclude with any certainty that a patient like Bradley did not have lung cancer, and that the thoracotomy that Dr. Sugarbaker performed was a "reasonable approach." Where Dr. Putnam disagrees with Dr. Sugarbaker's course of care is in his opinion that prior to performing the thoracotomy, the average qualified thoracic surgeon would have discussed with Bradley the alternatives, including core needle biopsy, observation, "and [only after] informed consent, surgery." Putnam Dep. at 57-61, 69-76. According to Dr.

---

[7] Dr. Putnam's expert report was served on the defendant on February 14, 2012. Counsel for the defendant took the deposition of Dr. Putnam on April 6, 2012. *Id.* ¶¶ 21, 22.

Putnam, this discussion should have included a warning that while Bradley could tolerate a thoracotomy, her prior trauma placed her at greater risk for complications than the average patient.[8] *Id.* ¶ 30; Putnam Dep. at 61. For her part, Bradley testified that had Dr. Sugarbaker explained the alternatives, she would have insisted on a fine needle biopsy, Pl. SOF ¶ 7, and had the results been negative (which they would have been), she would have refused a thoracotomy. *Id.* ¶ 8.

Informed Consent

The applicable principles are well established. "[A] physician owes to his patient the duty to disclose in a reasonable manner all significant medical information that the physician possesses or reasonably should possess that is material to an intelligent decision by the patient whether to undergo a proposed procedure." *Harnish v. Children's Hosp. Med. Ctr.*, 387 Mass. 152, 155 (1982). "Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment." *Id.* at 156, quoting from *Wilkinson v.*

---

[8] Dr. Putnam testified that he has treated patients with fungal infections within their lung cavities, although he does not identify a fungal infection as a risk particularly associated with a thoracotomy. *Id.* ¶ 31.

*Vesey*, 110 R.I. 606, 627 (1972). "The materiality of information about a potential injury is a function not only of the severity of the injury, but also of the likelihood that it will occur." *Precourt v. Federick*, 395 Mass. 689, 694 (1985). "At trial, the plaintiff must also show that had the proper information been provided neither [s]he nor a reasonable person in similar circumstances would have undergone the procedure." *Harnish*, 387 Mass. at 158. Finally, a plaintiff must also prove that "[a]n unrevealed risk that should have been made known . . . materialize[d]." *Id.* at 157-158, quoting from *Canterbury v. Spence*, 464 F.2d 772, 790 (D.C. Cir. 1972).

Dr. Sugarbaker rests his motion for summary judgment on the "undisputed facts of this case" – that "it was the opinion of the interventional radiologist . . . that fine needle aspiration was not an option, which made it reasonable for Dr. Sugarbaker to perform a surgical biopsy even in the opinion of Dr. Putnam." Def. Mem. at 9. This is accurate to a point, but it overlooks Dr. Putnam's ultimate opinion that while that the surgical biopsy Dr. Sugarbaker performed was a reasonable choice of care, this is only true if an informed Bradley agreed after being made aware of all other alternatives, including "observation with reevaluation" and "with a specific discussion of the

short-term and long-term risks and benefits [of a thoracotomy]."[9]  Putnam Dep. at 59, 61.

While Dr. Sugarbaker states that he relied on Dr. Jacobson's (the interventional radiologist) refusal to perform a needle biopsy on Bradley, that is a matter in dispute.  While Barbara Bradley's testimony as to what she had been told by Hung (the physician's assistant) is equivocal, she points to Hung's testimony that a refusal by Dr. Jacobson to perform a needle biopsy should have been documented in the medical record, and it is not.[10]  Neither Hung nor Dr. Jacobson have any memory to the contrary.[11]

In the alternative, Dr. Sugarbaker, relying on *Roukounakis v. Messer*, 63 Mass. App. Ct. 482 (2005), argues that as a matter of law "a plaintiff cannot support a claim of medical negligence based on an alleged failure to obtain

---

[9] When asked if "as a result of the discussion that the physician had with the patient the patient wanted a definitive diagnosis of the mass, they wanted to know as best as could be determined whether or not this was cancer or not cancer, would it be unreasonable under those set of circumstances for the surgeon to do a surgical biopsy?" – Dr. Putnam responded: "If the patient was of appropriate physical condition, could withstand the operation, the answer is that it would be appropriate."  Putnam Dep. at 61.

[10] Hung's record of his consultation with Jacobson states only that she recommended another PET/CT to be performed.

[11] While Dr. Sugarbaker insists that he told Bradley that a needle biopsy was an option (even though he thought it unreliable in making a pathologic diagnosis), she insists that he did not.  Sugarbaker Dep. at 46, 57. Opp'n Mem. at 4; Barbara Bradley Dep. at 106-129.

9

informed consent." Def. Br. at 10. However in *Roukounakis*, the Appeals Court was addressing the trial judge's refusal to instruct on informed consent where the radiologist had not found anything suspicious about the plaintiff's film.

> Had Dr. Messer acknowledged that there was some doubt about the mammogram, the judge suggested that he might have allowed the question of informed consent to go to the jury. . . . [I]n this case the question of informed consent cannot be separated from the issue of negligence. Often the issues are separate. . . . Here, however, the gist of plaintiff's medical negligence case is that Dr. Messer failed to read properly the 1993 mammogram and hence failed to perform an ultrasound. . . . Thus, for the jury to find that Dr. Messer had not complied with his duty of informed consent, they would first have to find substantially the same facts as they would have to find in order to determine him negligent – that he failed to recognize on the mammogram what the average qualified radiologist should have recognized.

*Id.* at 779-781.

In contrast, this case is, from beginning to end, about informed consent. Bradley alleges that Dr. Sugarbaker failed to advise her of less intrusive diagnostic procedures that she would have elected had she been so informed. She is not alleging, nor could she fairly do so (given Dr. Putnam's opinion and the absence of any other expert testimony), that Dr. Sugarbaker negligently performed the thoracotomy.[12] Because there are material facts in dispute about

---

[12] Bradley asserts that the thoracotomy created a pneumothorax necessitating additional operations, hospitalizations, and medical treatment. Dr. Sugarbaker

what Dr. Sugarbaker told Barbara Bradley about her alternatives and the associated risks, an entry of summary judgment on the one claim fairly presented, lack of informed consent, is precluded as a matter of law.

Battery

In the medical malpractice context, the common-law tort of battery is based on the absence of consent to a particular treatment rather than the lack of informed consent. *See Heinrich v. Sweet*, 49 F. Supp. 2d 27, 38 (D. Mass. 1999) (where plaintiffs allege that decedent did not give informed consent, rather than no consent at all, the action is one for malpractice, not battery); *Moore v. Eli Lilly and Co.*, 626 F. Supp. 365, 368 (D. Mass. 1986) ("Massachusetts allows plaintiffs to maintain cases in which there was an alleged lack of informed consent as negligence actions. . . . In order to state a cause of action for battery, plaintiffs must allege intentional acts by the defendant resulting in an offensive touching and the lack of consent to defendant's conduct."). *See also* W. Prosser, Law of Torts, § 32, at 165 (4th ed. 1971 ). The Massachusetts Supreme Judicial Court (in dicta) is in agreement. "Most authorities 'prefer to treat informed consent liability solely as an aspect

---

claims that the "infection" is a risk that did not need to be disclosed as a matter of law," however, it was nonetheless a risk that Bradley understood. Def. Reply Br. at 9. As this issue is one of damages arising out of the lack of informed consent claim, the court need not address it in context of the summary judgment.

of malpractice or negligence.' One reason is that the problem of informed consent is essentially one of professional responsibility, not intentional wrongdoing, and can be handled more coherently within the framework of negligence law than as an aspect of battery." *Feeley v. Baer*, 424 Mass. 875, 878 n.4 (1997), quoting 1 F. Harper, F. James, & O. Gray, Torts § 3.10, at 3:45-3:47 (3d ed. 1996). As Dr. Sugarbaker had Bradley's consent to perform a surgery (whatever the dispute about its parameters), there is no viable claim of battery as a matter of law.

## ORDER

For the foregoing reasons, defendant's motion for summary judgment on the issue of informed consent is <u>DENIED</u>; however, the motion is <u>ALLOWED</u> as to plaintiff's battery claim. The Clerk has set the case for trial to commence at 9:00 a.m. on February 17, 2014.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE